Christie Coal & Coke Co., Inc., et al. [1] Petitioners v. Commissioner. Christie Coal & Coke Co. v. Commissioner
Docket Nos. 4550-64 - 4554-64.
United States Tax Court
T.C. Memo 1969-92; 1969 Tax Ct. Memo LEXIS 204; 28 T.C.M. (CCH) 498; T.C.M. (RIA) 69092; May 12, 1969. Filed Carl F. Bauersfeld and William R. Creasey, for the petitioners. *206 Vallie C. Brooks, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies and an addition to tax in these consolidated cases as follows: Addition to
Tax Sec.
Docket
Taxable Year
Sec. 6651(a),
Petitioner
Number
Ended
Deficiency
I.R.C. 1954
Christie Coal & Coke Co.,
4550-64
12/31/56
$ 6,092.17
Inc
12/31/57
16,019.84
$4,004.96
12/31/59
377.54
12/31/60
4,003.50
Gibson Sales Corporation
4551-64
3/31/57
247.73
O. L. Gibson and Dotie D.
4552-64
12/31/56
15,782.18
Gibson
12/31/57
5,064.60
12/31/58
4,655.93
12/31/59
2,759.10
12/31/60
2,173.50
T. M. Gibson and Myrtle
4553-64
12/31/56
12,953.26
P. Gibson
12/31/57
4,727.17
12/31/58
4,257.11
12/31/59
1,568.15
12/31/60
2,302.28
Wise Development Company,
4554-64
8/31/56
2,436.16
Inc
8/31/57
2,657.15
8/31/58
1,992.91
8/31/59
2,882.06
8/31/60
2,945.60
Due to the concessions made by the parties, [2] the issues remaining for our determination are: (1) whether equipment "sold" on credit to Ruth (further *207 identified later) and certain amounts advanced to Ruth or paid on its behalf by the petitioners were properly deductible by them as bad debts under section 166, I.R.C. 1954, [3] during the years herein in issue; (2) if not, whether these amounts were deductible 500 by Wise, Christie and Gibson Sales as trade or business expenses under section 162; (3) if not, whether T. M. and O. L. Gibson constructively received dividends by reason of the payments made to or on behalf of Ruth by Gibson Sales, Christie and Wise; (4) whether Christie and Wise may deduct as bad debts under section 166, amounts due from C. & W.; (5) whether T. M. may deduct the expenditures he made on behalf of C. & W. during 1957 as ordinary and necessary trade or business expenses under section 162; (6) whether Christie properly deducted as interest $373.63 and $1,110.51 paid to O. L. Gibson during the taxable years 1959 and 1960; (7) whether for the taxable year 1958, T. M. Gibson properly deducted as a business bad debt under section 166, $300 loaned to the sheriff of Wise County in 1953; and (8) whether Christie failed to file timely an income tax return for the taxable year 1957 and is *208 liable for additions to tax under section 6651(a). Findings of Fact Some of the facts have been stipulated. The stipulations and exhibits attached thereto are incorporated herein by this reference. Petitioners T. M. Gibson (hereinafter sometimes referred to as T.M.) and Myrtle P. Gibson are husband and wife and for each of the calendar years 1956 through 1960, they filed a joint Federal income tax return with the district director of internal revenue at Richmond, Virginia. On the date their petition herein was filed they resided in Norton, Virginia. Petitioners O. L. Gibson, Sr. (hereinafter sometimes referred to as O. L.) and Dotie D. Gibson are husband and wife and for each of the calendar years 1956 through 1960, they filed a joint Federal income tax *209 return with the district director of internal revenue at Richmond, Virginia. On the date they filed their petition herein, they resided in Norton, Virginia. O. L. Gibson is the son of petitioners T. M. and Myrtle P. Gibson. Petitioner Christie Coal & Coke Co., Inc. (hereinafter sometimes referred to as Christie) is a corporation organized under the laws of the State of Virginia on March 1, 1951. Since its incorporation, its principal office and place of business has been located at Norton, Virginia. The principal business activity of Christie is the manufacture of coke. For the taxable year 1956, Christie timely filed its Federal income tax return on Form 1120 with the district director of internal revenue at Richmond, Virginia. For the year 1957, Christie filed its Federal income tax return, Form 1120, with the district director of internal revenue, Richmond, Virginia. For each of the years 1958, 1959, and 1960, Christie timely filed a Federal income tax return on Form 1120-S with the district director of internal revenue at Richmond, Virginia. On December 1, 1958, Christie properly filed on Form 2553 an election to be treated as a "small business corporation" with the district *210 director of internal revenue at Richmond, Virginia. According to Christie's stock certificate book, during the years 1956 through 1960 the corporation had 1,000 shares of common stock outstanding which was owned as follows: Number of
Shares
Petitioner T. M. Gibson
500
Petitioner O. L. Gibson, Sr
320
O. L. Gibson, Jr. (the son of O. L. Gibson, Sr.)
90
Tommie G. Lawson (the daughter of O. L. Gibson, Sr.)
90
Total shares issued and outstand- ing
1,000 However, on the Form 1120-S returns filed by Christie for each of the years 1958, 1959, and 1960, T. M. and O. L. were reported to own 500 shares each. [4]
Petitioner Gibson Sales Corporation (hereinafter sometimes referred to as Gibson or Gibson Sales) is a corporation organized under the laws of the State of Virginia on March 1, 1945. Since its incorporation, Gibson's principal office and place of business has been located at Norton, Virginia. During the years here involved, Gibson Sales was *211 a coal and coke sales agency and for each of the taxable years ending March 31, 1956 through 1960, Gibson Sales filed its Federal income tax return on Form 1120 with the district director of internal revenue at Richmond, Virginia. During its taxable years 1956 through 1960, its record books show that Gibson Sales had 100 shares of common stock outstanding, of which 48 shares were owned by petitioner O. L. Gibson and 52 shares were 501 owned by Auda G. Bonner (now deceased), sister of O. L. and daughter of T. M. Petitioner, Wise Development Company, Inc. (hereinafter sometimes referred to as Wise), is a corporation organized under the laws of the State of Virginia on August 8, 1946. Since its incorporation, the principal place of business and office of Wise has been located in Norton, Virginia. During the years here involved, Wise was engaged in the business of owning and leasing coalbearing lands. For each of the taxable years ending August 31, 1956 through 1960, Wise filed its Federal income tax return on Form 1120 with the district director at Richmond, Virginia. During the years 1956 through 1960, Wise had 600 shares of common stock outstanding with the owners of record *212 being the following: Number of
Shares
T. M. Gibson
298
O. L. Gibson, Sr
180
Auda G. Bonner
2
Tommie G. Lawson
60
O. L. Gibson, Jr
60
Total shares issued and outstand- ing
600
Ruth-Elkhorn Coals, Inc. (herein sometimes referred to as Ruth) is a corporation organized under the laws of the State of Kentucky on August 9, 1935. During the years 1954 through 1960, the principal place of business and office of Ruth was located at Norton, Virginia, and its principal business activity until May 1956 was coal mining. For each of the taxable years 1954 through 1960, Ruth filed its Federal income tax return on Form 1120 with the district director at Richmond, Virginia. During the years 1954 through 1960, Ruth had 500 shares of common stock outstanding. The following is a list of the owners of record during this period: Number of
Percentage
Shares
T. M. Gibson
362
72.4
O. L. Gibson, Sr
4
.8
Keith or Auda Bonner
90
18.0
Others
44
8.8
Total shares issued and outstanding
500
100.0
C. & W. Coal Corporation (hereinafter sometimes referred to as C. & W.) is a corporation organized under the laws of the State of Virginia on *213 May 9, 1947. Since its incorporation, the principal place of business and office of C. & W. has been located at Norton, Virginia. Until 1957, C. & W. was engaged in the strip mining of coal. For each of the taxable years ending April 30, 1956 through 1960, C. & W. filed its Federal income tax return with the district director at Richmond, Virginia. During the years 1956 through 1960, C. & W. had 680 shares of common stock outstanding. The records of C. & W. disclose the stock was owned during that period by the following: Number of
Shares
Ruth-Elkhorn Coals, Inc
380
A. Keith Bonner
132
Petitioner T. M. Gibson
40
V. R. Womack
128
Total shares issued and outstand- ing
680
During the years 1956 through 1960, the officers and directors of the aforementioned corporations were as follows: CHRISTIE COAL & COKE Co., INC. Officers: President - O. L. Gibson, Sr. Vice President - T. M. Gibson Secretary - F. O. Smith (deceased) to May 10, 1959 A. J. Lawson from May 10, 1959 and for 1960 Directors: T. M. Gibson O. L. Gibson, Sr. F. O. Smith (deceased) to May 10, 1959 A. J. Lawson from May 10, 1959 and 1960 GIBSON SALES CORPORATION *214 Officers: President - O. L. Gibson, Sr. Vice President - Auda G. Bonner Secretary - F. O. Smith to May 10, 1959 A. J. Lawson from May 10, 1959 and 1960 Directors: O. L. Gibson T. M. Gibson Auda G. Bonner WISE DEVELOPMENT COMPANY, INC.
Officers: President - O. L. Gibson Vice President - T. M. Gibson Secretary - F. O. Smith to May 10, 1959 A. J. Lawson from May 10, 1959 to and including 1960 Directors: O. L. Gibson T. M. Gibson F. O. Smith to May 10, 1959 A. J. Lawson from May 10, 1959 and 1960 502
RUTH-ELKHORN COALS, INC. *
Officers: President - T. M. Gibson Vice President - O. L. Gibson Secretary-Treasurer - F. O. Smith to May 10, 1959 A. J. Lawson (husband of Tommie G. Lawson) from May 10, 1959 and 1960 Directors: O. L. Gibson T. M. Gibson F. O. Smith to May 10, 1959 A. J. Lawson from May 10, 1959 and 1960 C. & W. COAL CORPORATION Officers: President - T. M. Gibson Vice President - A. Keith Bonner, Danville, Ky.
Secretary - F. O. Smith to May 10, 1959 A. J. Lawson from May 10, 1959 and 1960 Directors: T. M. Gibson A. Keith Bonner - 1956-1959 F. O. Smith - to May 10, 1959 A. J. Lawson - May 10, 1959 and *215 1960 O. L. Gibson - 1960 only Beck Electric Repair Company, Inc. (hereinafter sometimes referred to as Beck Electric) is a corporation organized under the laws of the State of Kentucky. During the years 1954 through 1960, its principal place of business and office was at Harlan, Kentucky, and its principal business activity was repairing and servicing mining equipment. During those years T. M. Gibson was a principal stockholder and president of Beck Electric, O. L. Gibson was secretary, and F. O. Smith was assistant secretary. Issues 1,2, and 3 - Questions Concerning Dealings Between Ruth and Petitioners, T. M., O. L., Christie, Wise, and Gibson Sales T. M. Gibson was born in Russell County, Virginia, on December 19, 1882. Since early coal mining companies in Kentucky and Virginia, including payroll clerk and store manager. From 1917 until 1937 he was general manager of the mining operations of the R. C. Tway Coal Company in Harlan, Kentucky. In April 1937, T. M. bought the Steinman Coal Mine near Clintwood, Virginia, under a lease purchase agreement which provided for the payment of a royalty of 10( per ton on each ton of coal mined until the *216 seller had been paid the sum of $125,000. T. M., through Ruth, operated the Steinman Mine for 18 years and paid off the purchase price. In addition to the $125,000 worth of equipment received with the purchase of the Steinman Mine, T. M. had Ruth purchase $250,000 in additional equipment during its profitable 18-year operation of the mine. In about 1946, T. M. Gibson and O. L. Gibson purchased 5,500 acres of coal land in Wise County, Virginia, for $60,000 and organized Wise to hold title to this land. After spending quite a sum of money prospecting the land, T. M. concluded that the seam of coal on Wise property at the Tacoma Mine was what is known as the Raven Red Ash Seam. On January 1, 1954, Ruth executed a lease to mine coal on property owned by Wise known as the "Raven Seam of coal." The pertinent provisions of such lease are as follows: 4. The term of this lease is twenty-five (25) years from the date hereof, but * * * [Ruth] shall have the right to renew said lease for an additional term of twenty-five (25) years upon the same terms and conditions, provided * * * [Ruth] notifies * * * [Wise] in writing of its intention to renew said lease at least one year from the *217 expiration date of the original term. 5. * * * [Ruth] doth hereby covenant to pay * * * [Wise] its successors or assigns, during the continuance of this lease as rental for the said premises a royaltly of twenty (20() cents per ton for every ton of two thousand (2000) pounds of coal mined from said seam and up to * * * [Ruth's] realization of Four and 50/100 ($4.50) Dollars per ton, but subject to an increase of one (1() cent per ton for each additional realization of ten (10() cents per ton up to five ($5.00) dollars per ton, but with a maximum royalty of twenty-five (25() cents per ton. The minimum rent or royalties, however, shall be five hundred ($500.00) a month. 6. No rental or royalties shall be due and payable and none shall accrue hereunder until after June 30, 1954. 7. The said rents and royalties shall be accounted for and paid on the 25th day of each month for all coal mined during the next preceding month as per weights of railway companies or other standard scales. * * * 9. * * * [Ruth] shall commence and prosecute the necessary work immediately for the operations contemplated under this lease. It shall work and mine the coal from said Raven Seam according *218 to the accepted standard of mine 503 engineering prevailing in the Virginia field, and in conformity with the laws now existing or hereafter passed by the State of Virginia and the United States of America. To furnish to * * * [Wise] on the 1st day of January and July of each year during the continuance of this lease, a map of the mine workings in and upon the premises, brought up to date. To mine and remove from said seam all minable and merchantable coal in all openings, leaving only such coal as may be necessary for the security of said premises. To rob or mine all pillars in all rooms and entries which should be mined, without impairing the security of said rooms and entry ways. 10. * * * [Ruth] covenants "to pay the taxes" pursuant to Section 55-76 of the Virginia Code. * * * 15. * * * [Wise] may re-enter for default of ninety (90) days in the payment of rent or royalties, or for the breach of covenants, pursuant to Section 55-79 of the Virginia Code. 16. Upon the termination of this lease * * * [Ruth] shall have the right, within a reasonable time thereafter, to remove all of its equipment, machinery, buildings, and other improvements from the demised premises. *219 On July 1, 1954, the lease was amended to provide for the deferral of royalties payable as follows: THEREFORE, the parties mutually agree that said mining operation would not be profitable for a considerable period of time and that it would be to the best interests of all parties for the mine opening to be extended back at least three thousand (3000) feet before profitable mining can be anticipated, and Paragraph 7 of said lease agreement of January 1, 1954, must necessarily be modified. THEREFORE, the parties mutually agree that in consideration of * * * [Ruth's] undertaking the mining venture, that no royalties will be paid for any coal mined until * * * [Wise] has mined at least 3000 feet and thereafter until the mining operation of * * * [Ruth] shall become profitable and all royalties until such time are hereby mutually agreed by the parties hereto to be waived. The Raven Seam leased to Ruth was one of a number of large seams of coal under the 5,500 acres of land owned by Wise in Wise County, Virginia. Engineers of Ruth estimated that the Raven Seam of coal leased to Ruth was minable under at least 5,000 acres, and the recovery of coal would be at least 25 million *220 tons. Ruth moved much of its equipment from Steinman to Tacoma and commenced development of the Tacoma Mine. A shaft was driven on an 11 percent grade to a depth of 3,000 feet where the seam leveled off to its normal pitch in that area. The development of the mine took aproximately two and one-half years, during which time Ruth, through its sales agent Gibson Sales, sold the coal extracted to the TVA and to Christie. In 1953, T. M. Gibson and O. L. Gibson borrowed $30,000 and secured the loan by mortgaging their jointly owned Kentucky farm. They transferred the proceeds to Ruth and this advance was carried on Ruth's books until 1960 in an account designated "T. M. and O. L. Gibson Loan Account." This advance was not evidenced by any note and was not secured in any way. No interest or payment of principal has ever been received by T. M. and O. L. and the advance was subsequently subordinated to a SBA loan (discussed below). The same year they (T. M. and O. L.) transferred to Ruth a Myers-Whaley loading machine and recorded this as a sale of equipment. Neither the advance nor the sale was secured. In order to continue the development of the Tacoma Mine, it became necessary in 1954 *221 for Ruth to obtain additional operating funds. On October 21, 1954, Ruth secured a Small Business Administration loan (hereinafter referred to as "SBA loan") in the amount of $150,000, from the Harlan National Bank, executing a promissory note in connection therewith. The note provided for repayment of the loan in installments, with the principal installments to be $25,000 on October 21, 1955, and $12,500 on the 21st day of April and October of each year thereafter, until the principal and interest accrued thereon were fully paid; provided that the entire indebtedness, if not sooner paid, was to be due and payable on October 21, 1960. Interest installments were to be paid on November 21, 1954, and on the 21st day of each month thereafter at the rate of 6 percent per annum on the unpaid balance. In its application for the SBA loan, Ruth stated that the proceeds of the $150,000 loan would be used to pay the following: Accounts payable as of March 31, 1954
$ 41,000
Repay Gibson Sales Corporation for cash borrowed and used in
38,900
new mine for equipment and development
Purchase of large cutting machine on caterpillar track
35,000
Purchase six chain conveyors
35,100
Total
$150,000
*222 With its loan application, Ruth also submitted the following balance sheet as of October 31, 1954: 504 ASSETS
Current Assets:
Cash in office
$ 18.61
Cash in bank (Citizens National Bank)
43.17
Deposits with others
33.50
Merchandise inventory
4,368.88
Payroll overdrafts
1,614.61
B. H. Body - note receivable
6,400.00
Group insurance receivable (Beck Elec- trical
254.74
Repair Co.)
Keith & Auda Bonner
6,039.82
C. & W. Coal Corporation
2,385.61
Christie Coal & Coke Co. (store acct.)
1,359.00
Gibson Farms
3,733.67
Rudd Patton (note receivable)
5,489.50
Miscellaneous - accounts receivable
296.17
Total current assets
$ 32,037.28
Development - Tacoma Mine
131,245.61
Fixed Assets:
Buildings
$ 8,892.61
Furniture & fixtures
12,338.02
Trucks & autos
26,908.35
Mining equipment - bought 1937 to 1953
160,579.23
Mining equipment - bought 1953 & 1954 (Tacoma)
154,112.85
$362,831.06
Less reserve for depreciation
110,584.56
252,246.50
Prepaid Insurance
9,624.91
Treasury Stock - C. & W. Coal Corporation
38,000.00
TOTAL ASSETS
$463,154.30
LIABILITIES
Current Liabilities:
Accounts payable
$ 65,274.38
Notes payable
34,733.32
Payroll due labor
3,208.48
Payroll taxes payable
829.59
Compensation insurance payable
1,354.03
Federal income tax withheld
389.60
Bank overdraft - Harlan National Bank
440.13
Group insurance payable
239.14
Steinman Employees Association
532.00
Gibson Sales Corporation - advance on coal account
7,016.86
Total current liabilities
$114,124.53
Due Officers:
T. M. Gibson
$ 15,367.36
O. L. Gibson
4,641.12
T. M. & O. L. Gibson
30,000.00
50,008.48
Due Other Corporations:
Christie Coal & Coke Co.
$ 5,355.16
Gibson Sales Corporation (loan)
38,900.00
Wise Development Company
14,258.78
58,513.94
Unclaimed Wages
309.92
Reserves:
Reserve for health & welfare
$ 4,066.43
Reserve for vacation payments
1,885.60
5,952.03
Capital Stock
$ 50,000.00
Capital Suplus
49,673.63
Earned Surplus
131,014.10
Profit to October 31, 1954
3,557.67
Net Worth
234,245.40
TOTAL LIABILITIES AND NET WORTH
$463,154.30
*223 505 In order to induce the Harlan National Bank (hereinafter sometimes referred to as the Bank) to make the loan to Ruth, and as a condition to insuring the loan, the SBA required Ruth, T. M. Gibson, Christie, Gibson Sales, Wise, C. & W., and Beck Electric each to execute a guaranty to the Bank. The guaranty agreements required the guarantors unconditionally to guarantee to the Bank, its successors and assigns, the due and punctual payment, when due, of the principal and interest on the note of Ruth. Pursuant to appropriate authorizing resolutions adopted by the boards of directors of the respective companies, the required guaranties were executed. As security for the loan and as security for performance of the guaranty agreements, Ruth, Wise, C. & W., and Christie were required by the SBA to execute deeds of trust covering all property owned by each company. Accordingly, on November 16, 1954, Ruth and Christie executed deeds of trust, as did Wise and C. & W. on November 26, 1954. In addition to the guaranties, the SBA required T. M., O. L., Wise, C & W., Christie, and Gibson Sales, as creditors of Ruth, to execute standby agreements. In compliance with such requirements, *224 T. M. Gibson, O. L. Gibson, and Wise each executed standby agreements on October 21, 1954. On November 26, 1954, Wise also executed a joint standby agreement with C. & W., Christie, and Gibson Sales. Each of the standby agreements provided, inter alia, that the standby creditors would subordinate to the SBA loan all prior and subsequent advances made by them to Ruth. Moreover, the standby agreement executed on November 26, 1954 by Wise, C. & W., Christie, and Gibson Sales stated that each of the standby creditors by special agreement dated October 21, 1954, had agreed to make certain additional advances to Ruth. This special agreement, in turn, provided that the standby creditors were to advance sums to Ruth to enable it to meet installments on the SBA loans. As a result of adverse conditions, as well as a decline in the price of coal, Ruth discontinued mining operations at the Tacoma Mine in May 1956. In a letter dated August 28, 1956, T. M. Gibson advised the SBA that he was of the opinion that a large corporation could make the Tacoma Mine a highly successful operation by installing a complete modern cleaning plant. He stated that the Island Creek Coal Company, the U.S. Steel *225 Corporation, Standard Alloy and Chemical Corporation, and Leckie Coal Company all expressed an interest to him in buying the Tacoma Mine and its equipment from Ruth. T. M. Gibson further stated in the letter to the SBA that if Ruth was not able to negotiate a sale or lease of the Tacoma Mine, it would be able to sell its equipment on the open market for more than enough to pay the balance it owed on the SBA loan. In a letter to the Simpson Coal and Chemical Corporation dated December 21, 1956, attorney Henry C.Bolling of Norton, Virginia, offered on behalf of T. M. Gibson to sell the Tacoma Mine and its equipment for $150,000 with a 30-year lease at 10( a ton royalty with no minimum royalty for the first year and a $500 monthly minimum royalty for the second year and $750 monthly minimum thereafter. Around 1957 or 1958, T. M. Gibson offered to sell the Tacoma Mine with its plant and equipment to Leckie Mining Company of Bluefield, West Virginia for $135,000 and a 20( per ton royalty on all coal mined from the property. Leckie Mining Company did not accept the offer for the reason that it felt the price of the plant and equipment was too high and the mining costs would be prohibitive. *226 In February or March of 1957, Electric and Machine Supply Company of Whitesburg, Kentucky, offered to buy the mining machinery and equipment located at the Tacoma Mine from T. M. Gibson for $70,000, but the offer was never accepted. During the years 1956 through 1961, the Tacoma Mine was maintained on a standby basis while attempts were made to sell or lease the mine and its equipment. The cost of keeping the mine open during this period approximated $2,000 per month. In 1961 the pumping of the Tacoma Mine was discontinued and the mine was permitted to fill with water. To meet the expenses of labor, power, equipment repairs, taxes, and insurance incurred in keeping the mine clear of water and in a good state of repair, T. M. Gibson, Christie, Wise, and Gibson Sales made various payments, with a substantial portion of these payments going directly to Ruth. In addition, because Ruth's financial condition rendered it incapable of meeting some of the installments of principal and interest on the SBA loan as these amounts became due, T. M. Gibson, Christie, Wise, Gibson Sales, 506 and C. & W. fulfilled their obligations as guarantors and made payments on the SBA loan. These *227 payments were made by the guarantors either directly to the SBA or Bank, or to Ruth which in turn remitted these amounts to the Bank. Beginning in August of 1956, after mining operations at Tacoma had been discontinued, the guarantors on the SBA loan started experiencing financial difficulties with respect to repayment of the loan. By October 1958, the financial resources of the guarantors were seriously depleted and they were unable to continue meeting the installments of principal and interest on the loan as they fell due. Accordingly, Ruth, the primary obligor, requested an extension of time for payment, stating that upon consummation of certain transactions then being negotiated by Christie and Wise, there would be available funds from which to repay the loan. Since the loan was in default, servicing of it was taken over from the Harlan National Bank by the SBA. By January of 1960, the total amount in default was $37,500 plus two installments of interest. In March of 1960, the SBA agreed to carry the loan in a past-due status if payments of $1,000 were made monthly and suggested that this amount be advanced to Ruth by Christie and Wise. From 1960 until it was satisfied in 1963, *228 the loan was repaid in monthly installments with proceeds from the sale of land by Wise and of equipment by Ruth, and sale of land and buildings by C. & W. T. M. Gibson personally made cash advances to Ruth, advanced payments which were applied on the SBA loan, paid mine expense bills, obtained receipts from Ruth, and wrote off amounts as bad debts for the years 1953 to 1960, inclusive, as follows: 507 SBA
Advances
Payments for
to Ruth
Ruth
1953
11/30
Cash
$ 7,600.00
12/9
Cash
15,000.00
12/31
Mine
1954
2/28
Equip.Sold
5,000.00 4/17
Cash
1,300.00
4/25
Cash
3,000.00
5/31
Equip.Sold
11,000.00
6/14
Cash
1,500.00
12/31
Mine
1955
2/22
Cash
695.00
12/31
Mine
1956
1/6
Cash
5,000.00
7
Bill Paid
671.00
12/31
Cash
975.00
12/31
Mine
12/31
1957
12/31
Bills Paid
1,260.53
2/21
To SBA
2,500.00
12/31
Cash
4,081.43
10/21
To SBA
12,500.00
12/31
Mine
12/31
1958
2/26
Cash
12/31
Bills Paid
1,950.00
12/31
Mine
1959
12/31
Bills Paid
975.00
12/31
Mine
1960
12/31
Mine
Receipts
Amounts Charged Off as Bad Debts
Balance
from Ruth or
and Claimed as Such on Tax Return
Other Offsets
1953
11/30
12/9
12/31
5,724.69
16,875.31
1954
2/28
4/17
4/25
5/31
6/14
12/31
9,339.68
29,335.63
1955
2/22
12/31
8,869.32
21,161.31
1956
1/6
7
12/31
12/31
2,785.07
25,022.24
12/31
10,672.24
14,350.00
1957
12/31
2/21
12/31
10/21
12/31
384.92
34,307.04
12/31
15,000.00
19,307.04
1958
2/26
$ 650.00
12/31
12/31
914.48
20,992.56
1959
12/31
12/31
1,255.52
20,712.04
1960
12/31
1,363.51
19,348.53
*229 O. L. Gibson advanced funds and made charges to Ruth, otbained receipts and other offsets from Ruth, and charged off bad debts of Ruth for the years 1952 to 1958, inclusive, as follows: Advances
Receipts
Amounts Charged
to
from Ruth
Off as Bad Debts
Ruth
or Other
and Claimed as
Offsets
Such on Tax Return
Balance
1952
1/25
Cash Loan
$ 4,470.40
$ 4,470.40
1953
3/31
Equip.Sold
4,750.00
12/7
Cash Loan
15,000.00
12/31
Mdse.Purchases
4,592.36
19,628.04
1954
None
1955
12/31
Mdse.Purchases
160.28
19,467.76 1956
12/31
Mdse.Purchases
150.79
19,316.97
12/31
14,316.97
5,000.00
1957
12/31
Mdse.Purchases
190.00
4,810.00
12/31
4,784.71
25.29
1958
1/31
Mdse.Purchases
14.36
2/28
Mdse.Purchases
10.93
0
In 1953, when O. L. transferred equipment to Ruth, Ruth was not able to borrow money from a bank or otherwise finance the purchase of such equipment. The amounts in the above schedule shown as receipts and other offsets from Ruth to the account of O. L. Gibson were merchandise and groceries which O. L. obtained from Ruth's commissary. At the times O. L. Gibson *230 made the advances to Ruth, he did not receive any note or security nor was there a fixed date for repayment of such amounts. Christie made cash advances to Ruth, advanced payments which were applied on the SBA loan, paid mine expenses, obtained receipts and other offsets from Ruth, and wrote off amounts as bad debts in the amounts reflected in the schedule below. Christie claimed the amounts written off as bad debt deductions on its tax returns for the years 1956, 1957, 1959, and 1960. 509 Cash
Payments
Amounts
Receipts
Amounts Charged
Balance
Advances
on SBA
Paid
from
Off as Bad Debts
to Ruth
Loan
as Mine
Ruth or
and Claimed as
Expenses
Other
Such on Tax
Offsets
Return
1953
10/31
$ 0
11
500.00
500.00
12
500.00
500.00
12/31
0
1954
1/12
7,013.72
3,582.81
3,030.91 1955
1/12
8,080.98
2,338.76
8,773.13
1956
12/31
2,046.31
1,136.33
5,946.62
557.15
17,344.91
12/31 12,235.07
5,109.84
1957
12/31
9,991.56
6,066.00
10,254.33
780.65
30,641.08
12/31
30,641.08
0
1958
12/31
3,854.43
2,519.10
3,219.35
9,592.88
1959
12/31
5,816.94
15,409.82
12/31
15,409.82
0
1960
12/31
1,360.00
7,545.67
8,905.67
12/31
8,905.67
0
*231 Christie normally made advances of $1,000 to $2,500 to unrelated truck miners to aid in their purchase of equipment. Such advances were collected by Christie out of subsequent deliveries of coal to it. However, it was more usual for Christie to receive advances of money from its principal suppliers than for it to advance money. Christie made no efforts to enforce collection of the advances against Ruth. During the years 1951 through 1960, Wise made numerous advances to Ruth in the form of materials, cash, and the payment of expenses on an open account. The schedule below reflects such advances, the receipts and other offsets thereto, and identifies the advances applied to the SBA loan obtained by Ruth and the advances claimed by Wise as a bad debt on its income tax returns filed for its taxable years ended August 31, 1956, 1958, and 1960: 510 Cash Advances
Payments on SBA
Amounts Paid as
to Ruth
Loan
Mine Expenses
1951
8/31
$ 0
9/30
Timber
1,275.06
1952
3/31
Timber
374.00
3/31
650.38
4/30
Equip.
7,769.35
11/30
Timber
3,252.51
1953
11/30
Timber
873.22
1954
2/28
Timber
467.17
6/30
Timber
134.52
7/31
Timber
75.00
1956
12/31
2,919.50
1,030.50
1,500.00
8/31
1957
12/31
1958
12/31
16,230.30
2, 746.18
8/31
1959
12/31
3,868.05
3,378.81
1960
12/31
2,866.99
4,302.23
2,043.64
8/31
*232 Receipts from Ruth or Other
Amounts Charged Off as Bad
Balance
Offsets
Debts and Claimed as Such on Tax Return
1951
8/31
$ 0
9/30
1952
3/31
3/31
4/30
612.43
11/30
1953
11/30
1954
2/28
6/30
7/31
14,258.78
1956
12/31
19,708.78
8/31
14,258.78
5,450.00
1957
12/31
5,450.00
1958
12/31
24,426.48
8/31
20,440.00
3,986.48
1959
12/31
11,233.34
1960
12/31
20,446.20
8/31
17,557.62
2,888.58
Wise executed the guaranty on the SBA loan obtained by Ruth because the SBA would not approve the loan without the guaranties of T. M. Gibson, Christie, Wise, Gibson Sales, C. & W., and Beck Electric. Wise had never executed a similar guaranty for any other company. Wise advanced funds to Ruth to keep the mine open and did not attempt to revoke the lease when Ruth failed to continue operating the mine. During 1956, the amounts advanced by Gibson Sales to Ruth were of two types: (1) ordinary cash advances, direct loans, and (2) advances against future coal sales. Gibson Sales' ordinary cash advances to Ruth were applied to the SBA loan, and to mine expenses, for the years 1956 to 1960, inclusive, as *233 follows: Cash
Payments
Amounts
Receipts
Balance
Advances to
on SBA Loan
Paid as
from Ruth
Ruth
Mine Expenses
or Other
Offsets
Balance
1/1/56
$14,600.00
12/31
$12,431.51
$12,500.0 0
$0
$ 0
39,531.51
1957
12/31
0
0
0
0
39,531.51
1958
9/29
0
0
725.28
0
40,256.79
1959
12/31
0
373.85
1,555.51
0
42,186.15
1960
12/31
0
0
0
0
42,186.15 511 On the books of Ruth, this was carried as "Gibson Sales Corporation Loan Account." In addition, the other account entitled "Gibson Sales Corporation Coal Account" reflected the advances of cash to Ruth in 1956, for the coal received and sold for Ruth, and credited the coal sales against the cash advances. The schedule below reflects the amounts written off as a bad debt in 1957: Advances to
Coal Sold
Balance
Ruth
1956 Balance 1/1/56
$ 8,727.67
1
$ 6,000.00
$ 8,477.67
2
9,500.00
3,585.93
3
13,500.00
9,006.59
4
13,000.00
12,860.38$65
16,500.00
12,969.01
6
15,800.00
10,932.83
7
7,000.00
924.86
8
0
0
9
1,500.00
0
$82,800.00
$58,757.27
Total advanced during 1956
$82,800.00
Less total coal sold during 1956
58,757.27
Net increase in the total advanced
$24,042.73
during 1956
12/31
32,770.40
1957
3/31 Bad debt (claimed on Gibson Sales'
14,000.00
tax return for the fiscal year ending
3/31/57)
12/31
$18,770.40
*234 The above account was used as a running account. If at the end of each month there was a balance due from Ruth, it was not collected but allowed to run into the next month and thereafter. Gibson Sales has never executed a guaranty for any other company similar to the one it executed in favor of Ruth. Although Gibson has made advances to other unrelated coal mining companies and collected such advances by offsetting subsequent coal sales made on behalf of such companies, Gibson has never made advances in the amount that were made to Ruth. Generally, Gibson Sales collected the advances made to unrelated companies, except in two or three minor instances. Gibson Sales made no effort to enforce collection of the advances to Ruth. The Tacoma Mine produced a type of coal which, because of its low volatility was particularly well-suited to the production of foundry coke, the hard type of coke used in steel manufacturing. The margin of profit on foundry coke is approximately twice that of the softer non-foundry coke. The Tacoma Mine would have been a substantial source of low volatile coal. Christie, however, did not possess the equipment necessary for processing such coke nor could Christie *235 afford to purchase such equipment. Had Christie been able to obtain the proper equipment, the development and subsequent maintenance operation of the mine might have promoted the economic interests of Christie. It would have been a source of coal from which to produce foundry coke. Similarly, Gibson Sales, as Ruth's sales agent, could have provided a source of coal from which it could have derived sales commissions. To Wise, the owner of the mining property, the mine would have provided a substantial source of royalty income. On January 1, 1956, the balance outstanding on the SBA loan obtained by Ruth was $139,000. The outstanding balance on such loan on December 31, 1960, was $50,101.61. During the years 1956 through 1960, $88,898.39 in principal and $26,938.27 in interest, or a total of $115,836.66, was paid on the SBA loan. The $115,836.66 that was paid on account of the SBA loan during the years 1956 through 1960 originated from the following sources: 512 1956
Ruth- Elkhorn
GibsonSales
Wise
Development
*101/1-4/30
Interest
$ 2,780.00
*105/4
Principal
12,500.00
(Loan from
Bluefield Coal
Co.)
5/1-8/30
Interest
2,548.71
8/13
Principal
400.00
9/21
Interest
630.50
10/26
Interest
630.50
10/26
Principal
12,500.00
(Sale of
Equip.)
11/1-12/31
Interest
Totals
$18,459.21
$12,500.00
$1,030.50
1957
1/1-2/28
Interest
2/21
Principal
2/21
Principal
3/1-10/31
Interest
10/21
Principal
11/1-12/31
Interest
Totals
1958
1/1-4/30
Interest
4/25
Principal
12,500.00
4/25
Principal
1,489.00
6/1-8/31
Interest
373.55
$14,362.55
9/1-12/31
Interest
1,867.75
Totals
$16,230.30
1959
1/1-8/31
Interest
$ 1,120.65
$ 373.55
$ 1,120.65
9/1-12/31
Interest
736.60
747.10
12/4
Principal
2,000.00
Totals
$ 1,857.25
** $ 373.55
** $ 3,867.75
1960
108.36)
1/1-5/31
Interest
1,705.02
$ 363.05)
1/1-5/31
Principal
* 368.71
1,251.64
6/22
Interest
354.95
6/22
Principal
200.05
7/19
Principal
1,250.00
(Sale ofequip)
1,025.64
7/19
Interest
314.96
8/26
Interest
345.00
8/ 26
Principal
3,963.65
9/19
Interest
321.13
9/19
Principal
17.45
10/1-12/31
Principal
1,995.90
10/1-12/31
Interest
775.14
Totals
$ 6,094.77
$ 4,302.23
Totals All
$26,411.23
$12,873.55
$25,430.78
Years
*236 1956
ChristieCoal
C. & W. Coal
T. M. Gibson
Totals
& Coke
*101/1-4/30
$0(9/1-12/31
/55)
*105/4
5/1-8/30
8/13
9/21
10/26
10/26
11/1-12/31
$1,136.00
Totals
$1,136.00
$33,125.71
1957
1/1-2/28
$1,136.00
2/21
10,000.00
(Sale of
Shovel)
2/21
2,500.00
(Loan)
3/1-10/31
4,044.00
10/21
12,500.00
(Loan)
11/1-12/31
886.00
Totals
$6,066.00
$10,000.00
$15,000.00
$31,066.00
1958
1/1-4/30
$ 1,772.00
4/25
4/25
6/1-8/31
747.10
9/1-12/31
Totals
$2,519.10
$18,749.40
1959
1/1-8/31
($2,988.40 -
$0- 8/31/59)
8/31/59)
9/1-12/31
12/4
Totals
6,098.55
1960
1/1-5/31
1/1-5/31
6/22
6/22
800.00
7/19
7/19
8/26
8/ 26
($6,710.75 -
15,600.00
(real
property)
9/19
8/31/60)
9/19
10/1-12/31
10/1-12/31
Totals
$16,400.00
$26,797.00
Totals All
$ 9,721.10
$26,400.00
$15,000.00
$115,836.66
Years
*237 Ruth never has reimbursed Christie, Gibson Sales, Wise, and T. M. Gibson for amounts expended to pay the SBA loan or to maintain the mine on a standby basis. The tax returns filed by Ruth for the taxable years 1954 through 1959 * contain the following balance sheet information: 513 ASSETS
12-31-53
12-31-54
12-31-55
12-31-56
Cash
$ 3,202.69
$ 57,556.47
$ 2,378.83
$ 804.05
Notes receivable
16,976.77
13,942.97
15,774.70
16,046.69
Inventories
3,389.38
3,613.80
4,174.60
2,496.81
Prepaid expenses & supplies
12,736.56
5,545.25
7,381.13
3,158.59
Investments - C.&W. stock
38,000.00
38,000.00
38,000.00
38,000.00
Building - other depreciable
552,679.06
370,923.86
355,150.42
340,065.42
property
Less: accumulated
364,667.27
127,014.30
122,802.53
139,243.94
depreciation
$188,012.79
$243,909.56
$232,347.89
$200,821.48
Depletable asset -
124,262.23
131,245.61
131,427.18
131,427.18
Development
Less: accumulated depletion
5,487.04
118,775.19
131,245.61
Deposits
33.50
33.50
33.50
TOTAL ASSETS
$381,093.38
$493,847.16
$431,517.87
$392,788.30
LIABILITIES & CAPITAL
Accounts payable
$ 84,996.79
$ 75,416.89
$112,733.40
$182,802.60
Bonds, notes, and mortgages
65,000.00
207,399.98
203,887.85
182,197.99
payable
Accrued expenses - payroll
3,876.89
3,547.08
5,369.43
498.41
taxes
Reserve for estimated
1,219.01
1,261.46
2,166.60
2,038.94
expenses
Common stock
50,000.00
50,000.00
50,000.00
50,000.00
Paid in or capital surplus
49,673.63
49,673.63
49,673.63
49,673.63
Earned surplus and undivided
126,327.06
106,548.12
7,686.96
(74,423.27)
profits
TOTAL LIABILITIES & CAPITAL
$381,093.38
$493,847.16
$431,517.87
$392,788.30
*238 ASSETS
12-31-57
12-31-58
12-31-59
Cash
$ 2,677.30
$ 1,388.51
$ 1,498.45
Notes receivable
12,832.96
12,386.60
12,898.00
Inventories
3,503.09
2,375.09
2,129.29
Prepaid expenses & supplies
2,738.86
1,969.84
182.19
Investments - C.&W. stock
38,000.00
38,000.00
38,000.00
Building - other depreciable
337,865.42
321,157.07
321,157.07
property
Less: accumulated
137,410.86
120,702.51
120,702.51
depreciation
$200,454.56
$200,454.56
$200,454.56
Depletable asset -
131,427.18
131,427.18
131,427.18
Development
Less: accumulated depletion
Deposits
33.50
33.50
33.50
TOTAL ASSETS
$391,667.45
$388,035.28
$386,623.17
LIABILITIES & CAPITAL
Accounts payable
$191,746.25
$214,574.77
$217,979.99
Bonds, notes, and mortgages
176,965.03
168,456.66
171,769.54
payable
Accrued expenses - payroll
196.24
92.89
228.99
taxes
Reserve for estimated
208.79
2,720.55
2,820.14
expenses
Common stock
50,000.00
50,000.00
50,000.00
Paid in or capital surplus
49,673.63
49,673.63
49,673.63
Earned surplus and undivided
(77,122.49)
(97,483.22)
(105,849.12)
profits
TOTAL LIABILITIES & CAPITAL
$391,667.45
$388,035.28
$386,623.17
*239 The aforementioned balance sheets of Ruth as of December 31, 1956, includes fixed assets at a depreciated value of $200,821.48. Included in the fixed assets is mining equipment having a depreciated value of $183,253.33. Much of the mining equipment was old, used, and obsolete. However, there were pieces of equipment with value such as: 2 belt conveyors, some cutting machines, pumps, jack hammers, a power saw, and tipple equipment. Much of the equipment had been used by Ruth in the Steinman Mine before taking it to the Tacoma Mine. The balance sheet of Ruth as of December 31, 1956, also included as an asset an item listed as "Development - Tacoma Mine $131,427.18." This item represents the development cost of the Tacoma Mine such as the cost of labor, supplies, and other charges in connection with driving the shaft which were not charged to operating expenses. The accounts receivable of $16,046.69 included $2,545.35 which was due from C.&W. Also included as an asset of Ruth was C.&W. stock in the amount of $38,000. There was also an account payable reflected on the balance sheet of Ruth on December 31, 1956, owing to C.&W., so that Ruth could set the account receivable off against *240 this account payable. During the periods in question, Ruth operated a commissary which sold groceries and shoes. The commissary store had gross sales and gross profits for the years 1956 to 1960 as follows: Year
Gross Sales
Gross Profits
1956
$92,222.61
$11,941.27
1957
71,949.15
8,448.43
1958
19,909.91
(10.78)
1959
35,678.19
4,714.31
1960
42,429.82
8,880.96
During the years 1954 to 1960, inclusive, Ruth reported income and losses before net operating loss deductions and special deductions on its tax returns as follows: Year
Amount
1954
($24,465.98)
1955
( 98,861.65)
1956
( 77,633.46)
1957
( 2,699.22)
1958
( 20,360.73)
1959
( 8,365.90)
1960
6,790.12
The $6,790.12 income reported in 1960 included $31,560.19 denominated as 514 "forgiveness of indebtedness." These amounts had been claimed as bad debts by related companies, the petitioners herein. Issues 4 and 5 - Questions Relating to Dealings Between C. & W. and Petitioners Wise, Christie, and T. M. C. & W. was organized by T. M. Gibson to strip mine some of the land owned by Wise. During the years 1954 through 1957, C. & W. strip mined coal under a lease *241 with Wise. In 1957, T. M. assumed personal control of the corporation and attempted to revive its mining operations. T. M. controlled and managed C. & W.'s operation and paid some of its expenses. T. M. was unsuccessful in his efforts to make C. & W. profitable and C. & W. ceased business activities thereafter in 1957. On his income tax return for the year 1957, T. M. Gibson claimed a deduction in the amount of $7,457.04 as business expenses, which represented the expenses he claimed to have paid while attempting to operate the C. & W. strip mining operation in 1957. T. M. Gibson presented cancelled checks for 1957 in the total amount of $6,033.25. These represented payments of C. & W. expenses or advances to C. & W., and were denominated as loans on the checks. In the notice of deficiency, the Commissioner combined the $7,457.04 business expense with $510 which was deducted as traveling expenses, and disallowed the total deduction to the extent of $7,137.94. C. & W.'s balance sheet of April 30, 1957, was as follows: ASSETS
Cash
$ 431.40
Accounts receivable
11,532.74
Prepaid expenses
2,205.43
Equipment (net)
35,478.46
Land (surface rights only; mineral rights held by
8,400.00
Wise)
TOTAL ASSETS
$58,048.03
*242 LIABILITIES
Accounts payable
$49,217.68
Accrued taxes
939.43
Accrued payroll
81.29
Notes payable
$50,238.40
Capital stock
$68,000.00
Deficit
(60,190.37)
7,809.63
TOTAL LIABILITIES AND NET WORTH
$58,048.43 The three major assets held by C. & W., as indicated by the balance sheet of April 30, 1957, were "Accounts receivable," "Equipment," and "Land." The "Accounts receivable" included an amount of $4,453.60 due from Ruth. The "Equipment," as disclosed by the depreciation schedule attached to the Federal income tax return of C. & W. for fiscal 1957, included three buildings. When the buildings and land were subsequently sold, the amount realized was $1,041.31 less than the respective combined book values of the transferred assets. During the taxable years ended April 30, 1956 to April 30, 1960, inclusive, C. & W. reported income and losses before net operating loss deductions and special deductions on its tax returns as follows: Year Ended
Amount
April 30, 1956
($13,222.60)
April 30, 1957
( 47,352.11)
April 30, 1958
( 28,580.68)
April 30, 1959
( 388.04)
April 30, 1960
1,986.70
During the years 1956 and 1957, *243 Christie hauled coal for C. & W. from the latter's mine to Christie's tipple where the coal was loaded into railroad cars for shipment. Christie charged a fee for these services and accrued as income the amount so charged, although some of these charges were never paid by C. & W. During these years, Christie hauled coal for and charged dock fees to C. & W., purchased coal from C. & W., collected cash payments from C. & W., and wrote off as a bad debt of C. & W., and claimed on Christie's tax return for 1957 amounts as follows: Hauling
Dock Fees
Coal
Collections
Balance
Coal
Purchases
Cash
1956
9/30
$ 0
1/1/56-12/31/56
$2,496.15
$ 849.77
$823.22
$ 955.88
1,566.82
1957
1/1/57-12/31/57
6,540.15
1,784.60
125.53
5,616.48
4,149.56
12/31/57 Bad Debt
4,149.56
12/31/57
0 515 During the years 1955-1957, C. & W. was engaged in the strip mining of coal on leases obtained from Wise. The leases provided for the payment of a specified royalty on each ton of coal produced. As the coal was extracted, Wise accrued the royalties on its books, and on its tax return reported these amounts as income. During the *244 years 1954 to 1960, inclusive, Wise sold C. & W. red dog (waste from mines used to build roads), accrued royalties against C. & W. as coal was extracted under leases, advanced cash to C. & W., obtained receipts and other offsets from C. & W., and wrote off as bad debts of C. & W., the following amounts: Cash
Red Dog
Royalty
Receipts
Bad Debt
Balance
or Other
Offsets
1954
5/31
0
6/30
$10.80
1955
1
$ 341.94
2
482.81
3-8/31/55
1,440.66
$ 2,276.21
1955
9-8/31/56
4,310.56
$835.55
5,751.22
9/ 1/56 -8/31/57
8,497.48
14,248.70
8/31/57
$14,248.70
0
9/ 1/57 -
$458.73
1,793.31
458.75
1,793.31
8/31/58
9/ 1/58 -
234.07
234.07
1,793.31
8/31/59
9/ 1/59 -
810.69
810.68
1,793.32
8/31/60
8/31/60
1,793.32
0
In 1960, C. & W. sold two frame houses and land surface rights upon which such buildings were situated to a Dr. Shelly for $16,000. In 1963, C. & W. sold some mining equipment for $5,500. In 1965, C. & W. sold a 12-room frame dwelling for $8,000. The book value of the assets of C. & W. as of April 30, 1960, and 1961, according *245 to its income tax returns filed for such years, was as follows: ASSETS
4-30-60
4-30-61
Cash
$ 709.04
$ 676.57
Notes and accounts receivable
2,238.47
2,122.02
Buildings & depreciable assets (net after allow-
32,702.78
6,770.58
ance for depreciation)
Land
8,400.00
8,000.00
TOTAL ASSETS
$44,050.29
$ 17,569.17
LIABILITIES AND NET WORTH
Accounts payable
$55,889.59
$ 47,720.01
Notes payable
5,611.17
5,611.17
Accrued expenses
1,721.92
1,088.75
Loans from stockholders
6,045.26
Capital stock
68,000.00
68,000.00
Earned suplus
(87,172.39)
(110,896.02)
TOTAL LIABILITIES & NET WORTH
$44,050.29
$ 17,569.17
Issue 6 - Interest Deduction of Christie In 1959, Christie needed funds to build a tipple and a plant to crush and screen coke in order to continue its coke business and supply a certain type of coke to a fertilizer company. As Christie was unable to borrow the necessary funds elsewhere, O. L. Gibson obtained a loan of $13,000 from the First National Bank of Norton, Virginia, and advanced the proceeds of such loan to Christie. For such advance, O. L. received a note from Christie bearing interest at the rate of 6 percent. According *246 to the books and records of Christie, O. L. Gibson advanced $5,339 to Christie on March 10, 1959 and $7,000 on March 17, 1959, on an open account. On its 1959 and 1960 income tax returns, Christie claimed deductions for "interest" paid O. L. Gibson on such advances in the 516 respective amounts of $373.63 and $1,110.51. Typically, the interest payments received by O. L. Gibson from Christie were in turn paid to the Bank in satisfaction of the interest due on the Bank's loan to O. L. Gibson. According to the books and records of Christie as of December 31, 1958, 1959, and 1960, O. L. Gibson owed Christie $20,532.08, $6,724.86, and $9,940.57, respectively, on a stock subscription account. The initial entry in such stock subscription account occurred in 1950 in the amount of $23,821.80. Christie has never charged or collected any interest from O. L. Gibson on such account from its inception through the year 1960. Issue 7 - Bad Debt Deduction - Personal Loan to Sheriff In 1952, T. M. Gibson loaned the sum of $600 to Harold Fleming, the sheriff of Wise County, receiving in return therefor a promissory note executed by Fleming and his wife, Virginia, payable in twelve months bearing *247 interest at 6 percent per annum after maturity. In 1953, Harold Fleming was the sheriff of Wise County, Virginia. However, Sheriff Fleming had no known business dealings or business connections with T. M. Gibson. T. M. often made loans to employees and friends in need, but was not in the trade or business of lending money during the years 1953 through 1958. On July 28, 1953, T. M. Gibson received from Sheriff Fleming a check in the amount of $300 in partial payment of the loan. Sheriff Fleming died in 1958 and the balance was never repaid. T. M. Gibson claimed a business bad debt deduction in the amount of $300 in his return for 1958, which was disallowed in the notice of deficiency. Issue 8 - Additions to Tax for Failure to Timely File Tax Return For the calendar year 1957, Christie filed a Federal income tax return, Form 1120, with the district director of internal revenue at Richmond, Virginia. This return was received by the district director on June 9, 1958. The envelope in which the return was mailed to the district director bears the postmark date of June 6, 1958. Attached to its 1957 Form 1120, Christie filed a copy of Treasury Department Form 7004 (Application for Automatic *248 Extension of Time to File U.S. Corporation Income Tax Return) signed by its then Secretary, F. O. Smith, and dated March 31, 1958. On its 1957 income tax return, Christie reported a net loss and no tax liability. The income tax return for 1957 did not bear the customary stamp of the district director indicating that an extension for filing the return had been granted. The income tax returns filed by Christie for the years 1956, 1958, and 1959 with this district director displayed this stamp on the Form 7004 attached. For each of the years 1956 through 1960, petitioners T. M. Gibson and Myrtle P. Gibson and petitioners O. L. Gibson and Dotie D. Gibson reported their income for income tax purposes on the cash basis. For each of their taxable years involved in these cases, Christie, Gibson Sales, Wise, and C. & W. reported their income for income tax purposes on the accrual basis. The Commissioner determined deficiencies and penalties against Christie agregating $30,498.01 for the years 1956, 1957, 1959, and 1960. For the issues still in question, [5] the Commissioner gave the following explanation: The bad debt deduction *249 claimed of $12,235.07 resulting from advances to Ruth-Elkhorn Coals, Inc. has been disallowed. The bad debt deduction claimed of $34,790.64 resulting from advances to Ruth-Elkhorn Coals, Inc. and C. & W. Coal Corporation in the respective amounts of $30,641.08 and $4,149.56 has been disallowed. The deduction of $373.63 claimed for interest paid on advances by O. L. Gibson has been disallowed. The Commissioner determined a deficiency in Gibson Sales' income tax in the amount of $247.73 for the taxable year ended March 31, 1957 and attached the following explanation: The bad debt deduction claimed in the amount of $14,000.00 resulting from advances to Ruth-Elkhorn Coals, Inc. has been disallowed. The Commissioner determined deficiencies against O. L. aggregating $30,435.31 for the years 1956 through 1960. The following explanation was made by the Commissioner for these determinations, concerning only the questions still in issue: 517 It has been determined that one-half of the expenditures by Gilbson Sales Corporation, Christie Coal & Coke Co., Inc., and Wise Development Company for Ruth-Elkhorn Coals, Inc., in the respective amounts [6] * * * is taxable to you as constructive *250 dividends. [7] * * * The deduction of $14,316.97 claimed as a bad debt resulting from advances made by you to Ruth-Elkhorn Coals, Inc. has been disallowed. The Commissioner determined deficiencies against T.M. aggregating $25,807.97 for the years 1956 through 1960. The following is the explanation given by the Commissioner for these determinations concerning only the questions still in issue: The deduction of $10,672.24 claimed as a bad debt resulting from advances made by you to Ruth-Elkhorn Coals, Inc. has been disallowed. It has been determined that one-half *251 of the expenditures by Gibson Sales Corporation, Christie Coal and Coke Co., Inc., and Wise Development Company in the respective amounts of * * * for Ruth-Elkhorn Coals, Inc., is taxable to you as constructive dividends. * * * The bad debt deduction of $300.00 [for 1958] claimed for money loaned to Harold Fleming has been disallowed because the debt is held to be nonbusiness, subject to the limitation on capital losses. Inasmuch as you claimed $1,000.00 capital loss on your return, your taxable income has been increased $300.00. The Commisioner determined deficiencies against Wise aggregating $12,913.88 for the fiscal years 1956 through 1960. The following is the explanation given by the Commissioner for these determinations concerning only the questions still in issue: The bad debt deduction claimed in the amount of $14,258.78 resulting from advances to Ruth-Elkhorn Coals, Inc. has been disallowed. The bad debt deduction claimed in the amount of $14,248.70 resulting from advances to C. & W. Coal Corporation has been disallowed. The bad debt deduction claimed in the amount of $19,350.94 [for 1960] resulting from advances to Ruth-Elkhorn Coals, Inc. and C. & W. Corporation *252 of $17,557.62 and $1,793.32 respectively, has been disallowed. Ultimate Findings Monies advanced prior to October 21, 1954, by petitioners O. L. Gibson, T. M. Gibson, Gibson Sales, Christie, and Wise were debts of Ruth for purposes of section 166 and Wise, Christie, and Gibson Sales properly deducted the uncollected portion of these amounts as bad debts. However, the amounts owed T.M. and O.L. by Ruth were nonbusiness bad debts deductible only to the extent provided under section 166(d) (1)(B). Monies advanced to Ruth or payments made on its behalf after October 21, 1954, were not debts of Ruth for purposes of section 166. Petitioners O.L., T.M., Gibson Sales, Wise, and Christie improperly deducted these amounts as bad debts under section 166. Further, the amounts expended after October 21, 1954, also are not deductible by Christie and Gibson Sales as trade or business expenses under section 162. However, the amounts expended by Wise after October 21, 1954, were deductible as a trade or business expense under section 162. The amounts owed Christie and Wise by C. & W. were properly deductible by them as business bad debts. Amounts paid by Christie to O. L. in 1959 and 1960 *253 were improperly deducted by Christie as interest expenses for those years. For 1958, T.M. improperly deducted, as a business bad debt, amounts loaned to Harold F. Fleming. Further, petitioner Christie has not shown reasonable cause for its failure to timely file a tax return for the taxable year 1957 and so an addition to tax 518 for failure timely to file under section 6651 (a) is proper, in the amount of 15 percent of the deficiency for the taxable year 1957. Opinion Issue 1 - Bad Debt Deduction to Christie, Gibson Sales, O.L., T.M., and Wise The first issue is whether petitioners Christie, Gibson Sales, and Wise properly deducted certain amounts [8] as bad debts under section 166(a), [9] I.R.C. 1954, during the taxable years 1956 through 1960. As to the individual petitioners, T.M. and O.L., the issue is whether the amounts were debts and if so whether they were deductible as business or nonbusiness bad debts under section 166(d). The Commissioner disallowed these amounts as deductions. Accordingly, the burden rests on petitioners to prove the Commissioner's determinations were erroneous. Rule 32, Tax Court Rules of Practice.
*254 Petitioners contend that Christie, Gibson Sales, Wise, O.L., and T.M. are entitled to deductions for bad debts for payments made to or on behalf of Ruth, during the years 1956 through 1960, and also for amounts of sale of equipment to Ruth by O. L. and T.M. However, on brief, petitioners assumed an important premise to their argument, namely, that the amounts owing were bona fide debts of Ruth. See section 1.166-1(c), Income Tax Regs. Petitioners focused primarily on the issue of whether the "debts" became worthless during the years the deductions were taken. Contrariwise, the Commissioner asserts that these amounts are not deductible under section 166 because (1) the advances did not constitute bona fide loans, and (2) petitioner did not show them to be worthless (totally or partially) during the years in which they took the deductions. It is well established that under section 166 a taxpayer may not deduct amounts advanced as bad debts, unless, in substance, the advances were bona fide debts owed to the taxpayer. Section 1.166-1(c), Income Tax Regs. Accordingly, we must first ascertain whether a true debtor-creditor relationship *255 existed between Ruth and petitioners. In this regard it is the true or real intention of the parties that is the important factor. Sam Schnitzer, 13 T.C. 43, 60, affirmed per curiam 183 F. 2d 70 (C.A. 9,1950), certiorari denied 340 U.S. 911. Gooding Amusement Co., 23 T.C. 408, 418, affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031, and this is determined by examination of the facts. Affiliated Research, Inc. v. United States, 351 F. 2d 646 (Ct. Cl. 1965); cf. Ambassador Apartments, Inc., 50 T.C. 236, 241, affirmed per curiam 406 F. 2d 288 (C.A. 2, 1969). To aid in the solution of this muchlitigated question, the courts have resorted to certain tests as guides for ascertaining intention. Of these tests, thin capitalization (generally equated with a high debt-equity ratio); probability that a third party would have made a loan in the circumstances to the loss corporation; [10] repayment of the loan to be made from earnings only; reasonable expectation of repayment; [11] an 519 obligation to pay a definite sum at a fixed time; [12] and riskiness *256 of the loan, have been often employed to aid in the analysis of this question. For the purposes of our opinion, we separate our discussion into three distinct time periods during which monies were advanced by petitioners to Ruth, namely: (1) prior to the SBA loan; (2) at the time the SBA loan was made including performance of the obligations under the guaranty agreement by petitioners; and (3) at the time the mine was maintained on a standby basis. Advances Made Prior to the SBA Loan For several years prior to the SBA loan, petitioners advanced money and other goods to Ruth. The amounts footnoted below represent the net amounts claimed to be owed by Ruth as of October 21, 1954. [13] These disbursements, made prior to the SBA loan, were advanced during the early period of Tacoma Mine's development when the profitability of the mine seemed highly probable. *257 Being prior to the period of unprofitable operations for the mine, Ruth was not undercapitalized and had significant amounts of earned surplus from its prior successful operation of the Steinman Mine. Prospects for the repayment of these amounts appeared to be bright; the petitioners could look to the assets of Ruth for repayment as well as to possible future profits. We do not believe the parties thought there was any substantial risk of repayment involved so far as advances made prior to the SBA loan were concerned. We find that the parties intended these advances to be debts of Ruth and we so find. *258 To answer the Commissioner, at least in part, it is sufficient to say that the absence of written debt instruments does not wholly determine the issue of whether a true debt existed. At best, it is only some evidence of the ultimate fact. Byerlite Corporation v. Williams, 286 F. 2d 285, 290 (C.A. 6, 1960). However, that debts have been found to exist between petitioners and Ruth is not dispositive of the issue of whether petitioners may deduct these amounts under section 166(a) during the years in question. To do so, petitioners must also satisfy the other requirements of that section. Petitioners must still prove that the debts were business debts (so far as the individual petitioners are concerned) and that they became worthless during the years in which the deductions were taken. We believe the unpaid debts above became uncollectible at the time that Ruth ceased operations at the Tacoma Mine. As the prospect of their repayment at that time was slight, if any prospect at all existed, we hold that during 1956 these debts became totally worthless. However, were these business bad debts? So far as petitioners Wise and Christie are concerned, they were corporations *259 and under section 166(a) they may deduct the amounts in full whether or not the debts were "business" or "nonbusiness." The limitation in section 166(d), "Nonbusiness Debts," is only applicable to persons "other than corporations." Accordingly, with respect to the individual petitioners, T. M. and O. L., we must still determine whether the debts were business or nonbusiness. The facts of record fail to prove that these debts were acquired in connection with any individual trade or business of T. M. or O. L. Clearly they were not in the trade or business of 520 financing corporations (see Whipple v. Commissioner, 373 U.S. 193), nor have they even shown that these loans were necessary in order that they continue in their positions as officers and employees of Ruth (see Trent v. Commissioner, 291 F. 2d 669). Petitioners have failed to sustain their burden of proof in this regard. We hold these debts were nonbusiness bad debts of petitioners T. M. and O. L. Accordingly, they may only be deducted as provided in section 166(d). SBA Loans Petitioners, Wise, Christie, T. M.,and Gibson Sales, advanced monies [14] to Ruth or to the Bank (or the Small Business *260 Administration) to pay off the SBA loan during the period 1956 to 1960. The preliminary question is whether these amounts constituted debts of Ruth. To determine this, it is again necessary to ascertain the intentions of the parties, in this instance based upon the facts as they existed at the time the SBA loan (and guaranty) agreements were executed. At the time Ruth applied for the SBA loan, it submitted a balance sheet disclosing a debt-equity ratio of approximately 1:1 (with the amounts due to related persons included in the total amount of debt). See, e.g., 241 Corporation v. Commissioner, 242 F. 2d 759 (C.A. 2, 1957), affirming per curiam a Memorandum Opinion of this Court; Isidor Dobkin, 15 T.C. 31, affirmed *261 per curiam 192 F. 2d 392 (C.A. 2, 1951), cases in which outside debt was included to determine the ratio. In some instances, this ratio may be acceptable as evidence that a corporation was not undercapitalized. However, any conclusion concerning a debt-equity ratio can only be reached after the balance sheet has been closely scrutinized to determine realistic amounts of debt and equity. We do not believe the amounts shown on the balance sheet of Ruth disclose the full meaning of its financial position as of October 21, 1954, the time the SBA loan was made. The balance sheet figures reflect only historical costs for accounting purposes and not true fair market value. Properly to determine the net worth (equity) of Ruth at the time of the SBA loan, the amount of Ruth's debts and the value of the assets must first be ascertained. See, e.g., Ainslie Perrault, 25 T.C. 439; Sheldon Tauber, 24 T.C. 179; Ambassador Apartments, Inc., supra.From the facts we believe the debts were properly disclosed on the balance sheet but that the values of the assets were substantially less than the amounts shown thereon. There were three substantial *262 assets accounts: "Development - Tacoma Mine," with a book value of $131,245.61, "Mining Equipment," with a net book value of $252,246.50, [15] and common stock of C. & W. Coal Corporation, recorded at $38,000. The question is what was the value of these assets at the time the SBA loan agreements were executed. The value of each one of the aforementioned assets was given careful attention by the parties on brief and at the trial. With respect to Ruth's interest in the Tacoma Mine, the value of this leasehold improvement at the critical time did not equal a substantial portion of the costs reflected in "Development - Tacoma Mine" account. Ruth did not own the Tacoma Mine, but only leased it. We believe the lease, even with improvements, was not worth, to Ruth, the amount shown on the balance sheet as development cost. The profitability of the mine was questionable. That there were substantial quantities of high quality coal in the mine was evident; however, the problems of developing and operating the mine profitably appeared to be almost insurmountable. *263 This is borne out in the findings of fact where neither 521 Ruth nor Wise could sell or lease the mine at any time subsequent to the cessation of mining operations. For purposes of our analysis, we believe the value of the lease and its improvements was equal to no more than 25 percent of the development costs shown on the balance sheet at the time the SBA loan was applied for. We also believe that at this time the market value of the fixed assets, including buildings, furniture and fixtures, trucks, automobiles and mining equipment, was no more than 50 percent of the net amounts shown on the books of Ruth. Here, too, our findings are bolstered by the fact that much of the equipment was old and worn, that it was heavy and could not have been easily moved, and that the demand for older mining equipment had declined because of technical advances in the industry, and because the coal industry had become unprofitable. Apparently the only way in which Ruth could realize a substantial portion of its investment in this equipment would have been through the sale of it as part of an arrangement which included the lease of the mine. In view of the mine's difficulties, this appeared unlikely. *264 Further, we feel this finding is reasonable in light of the fact Ruth was unable later to sell this equipment at even substantially lower prices. [16]
Finally, we find that the C. & W. stock was worthless at all times pertinent. This is a fact that petitioners do not dispute. Applying the valuation estimates discussed above, as of October 31, 1954, Ruth's net worth must be decreased approximately $295,000, leaving Ruth with a minus net worth of approximately $60,000. This gives rise to an acute case of inadequate capitalization. [17]
In light of the above, we turn to the transactions relative to the SBA loan. It was quite apparent that the business had substantial risks; SBA recognized this and would not make the loan to Ruth unless the following conditions were met: (1) petitioners had to subordinate the amounts owed them by Ruth on account of advances *265 made prior to SBA, (2) petitioners had to guarantee repayment of the loan, and (3) petitioners had to secure the loan by executing deeds of trust on all the property of Ruth, Wise, Christie, and C. & W. for the benefit of the Bank, and (4) petitioners were required to make additional advances to Ruth. From these facts it is clear that the SBA was furnishing money to Ruth primarily on the credit of petitioners. After consideration of the facts, we find that petitioners have failed to show that at the time the SBA agreement was entered into, a bona fide debtor-creditor relationship was intended between petitioners and Ruth, when and if petitioners were required to make good on their guaranties. It is clear that in agreeing to make advances and to guarantee the loan, the petitioners had no reasonable expectation of repayment for monies paid out for Ruth, except from future profits, if any. Wilfred J. Funk, 35 T.C. 42. Moreover, it is clear from the record that an outsider would not have loaned Ruth money under the circumstances, or guaranteed the loan. This is evidenced by the fact that Ruth did attempt to secure outside financing on its own and failed. As an apparent *266 last resort, petitioners accepted the SBA financing arrangement rather than see Ruth cease operations because of a lack of funds. Petitioners must have known that by executing the guaranty arrangements, they were running the risk that Ruth could develop the Tacoma Mine into a profitable operation. Otherwise they would be sending good money after bad. We find that the amounts paid by petitioners in fulfillment of the guaranties under the SBA loan agreement did not give rise to a bona fide indebtedness owing from Ruth for purposes of section 166, and petitioners improperly deducted these amounts as bad debts on their tax returns. Fred A. Bihlmaier, 17 T.C. 620; C.M. Gooch Lumber Sales Co., 49 T.C. 649. Advances Made to Maintain Mine on Standby Basis Lastly, after the SBA loan was made, petitioners continued to advance Ruth money or pay expenses to maintain the mine in standby condition after the operations of 522 the mine were terminated. [18] These amounts also were deducted as bad debts by petitioner under section 166. The financial situation of Ruth during this period had not improved from the time discussed above, the possibility of Ruth's success *267 was still slight, and the parties should have been fully aware that these amounts could never be repaid except from future profits, an almost absent possibility here. During this period petitioners were charging off previous advances to Ruth as uncollectible, thus demonstrating their belief that Ruth lacked the ability to repay. For the reasons stated previously, we find that a bona fide debtorcreditor relationship was never intended by the parties for the amounts in question. Accordingly, petitioners may not deduct these amounts as bad debts under section 166. *268 Section 162 - Trade or Business Expenses for Wise, Gibson Sales, and Christie As we have found above, some of the advances and other expenses paid by petitioners did not constitute debts of Ruth. Petitioners Wise, Gibson Sales, and Christie, in the alternative, assert they should be permitted to deduct these amounts [19] as 523 trade or business expenses under section 162. [20]
Petitioners contend these expenditures were made to promote and protect their businesses and did not result in the acquisition of a capital asset, thus qualifying as deductions under section 162, citing Fishing Tackle Products Co., 27 T.C. 638; Scruggs-Vandervoort-Barney, Inc., 7 T.C. 779; *269 Charles J. Dinardo, 22 T.C. 430. Whether these amounts constituted ordinary and necessary expenses incurred in the operation of petitioners' trade or business is a question of fact to be determined from the evidence presented, with the burden being on petitioners to overcome the Commissioner's determination. Welch v. Helvering, 290 U.S. 111. With respect to Christie and Gibson Sales, we are not convinced that these expenses were "ordinary and necessary" in carrying on their "trade or business," when viewed in the light that the amounts involved were substantial and that Ruth had slight prospect of success. Cf. Welch v. Helvering, supra. The argument that the expenses were incurred because they would insure Gibson Sales and Christie a source of supply has little weight in the circumstances of this case. Compare Tulane Hardwood Lumber Co., 24 T.C. 1146. Petitioner, Gibson Sales, asserts that it has advanced funds to other customers so that its actions here were not extraordinary. The record shows, however, that Gibson Sales advanced only a fraction of the amounts claimed here in other instances and never continued to do so if *270 repayment was not promptly made. Further, Gibson Sales never guaranteed the debts of other customers as it did for Ruth. In the case of Christie, petitioner argues that Christie could purchase Ruth's coal (a high quality hard coal) for use in Christie's coke manufacturing process. The facts disclose, however, that without a significant investment in additional facilities by Christie, Christie would not have any substantial use for Ruth's product. We cannot find that it was "ordinary and necessary to the carrying on" of Christie's trade or business for Christie to advance monies to Ruth, guarantee Ruth's debts, and pay certain operating expenses of Ruth. Again, in light of the slight prospect of Ruth's success, these advances were not realistically made to further the trade or business of petitioners Christie and Gibson Sales. We find for the Commissioner on this issue insofar as it relates to Christie and Gibson Sales. With respect to Wise, the situation is somewhat different. As owner of the coal land leased to Ruth, Wise could reasonably expect to derive royalty income under this lease. [21] Accordingly, it is not so difficult to see how monies advanced and expenses paid to Wise *271 to keep the mine in operating condition were made with a more reasonable expectation of promoting its business. There was a direct relationship between the success of Ruth and royalty income to be derived from the mine. Wise possessed contractual rights under the lease for royalties that would have been of signif cant value if and when Ruth operated profitably. Even though the chance of succeeding may have been slight, the amount of income Wise could derive from the mine, we believe was great enough for a reasonable businessman to have made the expenditures involved. As Wise possessed a substantial business interest in Ruth's development of the mine, it was sufficient to qualify Wise's advances to Ruth and the guaranty payments on the SBA loan as business expenses, under section 162. We hold the amounts here in question to be deductible as ordinary and necessary busines expenses. Constructive Dividends for T. M. and O. L. The Commissioner further determined that petitioners T. M. and O. L. must recognize *272 as dividend income the advances made by Gibson Sales, Wise and Christie on behalf of Ruth which we have found not to be valid business debts. The Commissioner's theory is premised on the assumption that there was no business purpose for these corporations to make the advances to Ruth and that the only reason for doing so was to benefit T. M.and O. L. by funding Ruth. 524 As indicated above, Wise had a valid business purpose for making the advances sufficient for them to qualify as a business expense. Accordingly, that a corporation makes expenditures for a valid business reason which may also benefit one or several shareholders does not give rise to dividend income. As this is the case here, we hold petitioners T. M. and O. L. did not realize dividend incom by reason of the advances made by Wise to or for the benefit of Ruth. With respect to Gibson and Christie, we have found above that the monies later expended by them subsequent to the SBA loan did not qualify as "ordinary and necessary expenses incurred in the carrying on of their trade or business." However, we do believe there was a business purpose, tenuous though it was, for making these advances. Accordingly, we find *273 the advances were not solely for the personal benefit of the shareholders T. M. and O. L. This is not to say there cannot be constructive dividends where intercorporate advances and guaranties are paid which rebound to the benefit of majority or sole stockholders in related corporations. However, we do not think this is such a case and we hold for petitioners on this issue. Issue 4 - Bad Debt Deduction for Christie's and Wise's Advances to C. & W Christie and Wise deducted $4,149.56 and $14,248.70, respectively, as bad debts for the taxable year 1957, and Wise deducted $1,793.32 for 1960 for amounts allegedly owed to them by C. & W. The Commissioner disallowed these deductions and Christie and Wise, in their petitions, alleged error in the Commissioner's actions. The Commissioner contends primarily that the amounts purportedly due from C. & W. and deducted as bad debts were not in substance debts of C. & W., but rather equity investments by petitioners in C. & W. The Commissioner maintains this position because "no unrelated party would make a loan to C. & W.," and therefore he asserts the amounts were improperly deducted as bad debts. Upon examination of the amounts in question, *274 we find the totals were not composed of advances of money made to C. & W. by petitioners but rather were ordinary accounts receivable that had accrued when sales on account were made to C. & W. Christie charged C. & W. fees for hauling coal and dockage and these amounts were accrued on Christie's books as income at the time the receivable was debited. With respect to Wise, the amounts in question in the accounts receivables appeared when royalty income [22] for the use of the land was accrued and the corresponding debit to accounts receivable was made. As petitioners recognized income when the accounts arose, we believe it is proper to allow a deduction when the account proves uncollectible later. There is nothing in the record to indicate that these amounts should be treated any differently than any other ordinary credit sales wherein the seller accrues and recognizes income when the accounts receivable are set up on its books, and then, when the accounts prove to be uncollectible the seller writes off the account as a bad debt, deducting the amount under section 166. To us, that Christie and Wise were *275 controlled by the same individuals who ran C. & W., is not a factor that should cause a different result, under all the circumstances herein. We believe the amounts involved were bona fide debts and that the deductions taken by petitioners Christie and Wise were proper. Here, petitioners possessed a reasonable expectation of prompt payment because the receivables represented charges for services that directly contributed to the production of current income. It was not unreasonable for petitioners to believe that the amounts due would be collected. The source of payment was not income to be earned at some undeterminable time in the future but rather from present revenues petitioners were aiding C. & W. to earn. We find these amounts did constitute bona fide debts of C. & W. Without lengthy discussion of the worthlessness of the debt, we conclude that the financial condition of C. & W. was so poor at the time petitioners deducted the amounts as bad debts that they were justified in their belief that collection would not be forthcoming. Accordingly, we find that the accounts constituted bona fide debts, which in fact became totally worthless and thus were properly deducted by petitioners *276 Wise and Christie in the years the deductions were taken. 525 Issue 5 - Deductibility by T. M. of Payments of C. & W.'s Expenses On T. M.'s income tax return for the year 1957, he claimed a deduction of $7,457.04 as business expenses. This total purportedly represented amounts owed to creditors of C. & W. and paid by T. M. while he operated C. & W. during 1957. The Commissioner disallowed the deduction to the extent of $7,137.94. T. M. introduced into evidence his personal checks totaling $6,033.25, which generally bore the notation of loans to C. & W. He argued that the amounts in issue were deductible as a trade or business expense under section 162. He made this contention in his brief as follows: T. M. Gibson's principal interest in C. & W. was that of a salaried official whose salary income was entirely dependent on the success of the mining operations. Unless C. & W. was in operation, T. M. Gibson could expect no income. Thus, to protect his source of income, it was necessary for T. M. Gibson to assume complete responsibility for the daily operating expense connected with C. & W.'s strip mining activities. Since the expenditures made by T. M. Gibson were directly *277 related to his employment, they are deductible as ordinary and necessary business expenses. Cf. Alfred LeBlanc, 7 B.T.A. 256 (1927); Lillian Goldsmith, 7 B.T.A. 151 (1927). Petitioner's arguments do not find basis in the facts of the case. T. M.'s tax returns for the years 1956, 1957 and 1958 do not disclose the receipt by him of salary or income of any kind from C. & W. Accordingly, petitioner's reliance upon the argument is misplaced. T. M. also argues that he was acting essentially as a sole proprietor in the operation of C. & W. and therefore, that the expenses were ordinary and necessary to his trade or business of operating the mine and that he should be allowed to deduct these expenditures. In effect, T. M. argues that we disregard the corporate entity and equate the trade or business of C. & W. with his business. From the facts we see no reason to do this. It is well established that individual stockholders may not deduct under section 162, business expenses of a corporation paid by the individual. [23]Deputy v. Dupont, 308 U.S. 488. We find for the Commissioner on this issue. *278 Issue 6 - Deductibility of Interest Payments by Christie During its taxable years 1959 and 1960, Christie paid O. L. $373.63 and $1,110.51, respectively, and deducted these amounts as interest on its tax returns for those years. In 1959, Christie received some money from O. L. to build a tipple. O. L. had borrowed the money from a bank in Norton, Virginia, and then advanced the proceeds of this loan to Christie, since Christie itself could not find some third party to finance the tipple. O. L.'s advances were made on open account. The interest paid by Christie was the same amount O. L. owed on his note to the Bank. Typically, O. L. would turn over the amounts paid to him by Christie to the Bank to pay his own interest. The facts clearly indicate that Christie was forced to turn to O. L. as it could not borrow the money on its own credit. The amounts borrowed by O. L. from the Bank equaled the amount advanced to Christie. Accordingly, petitioner O. L. believes: The very fact that O. L. Gibson provided the needed financing through funds that he borrowed and secured personally from the bank indicates that the advance to Christie was indeed a loan. The latter, unlike a contribution *279 to capital, assured a definite return of principal and interest to be applied on the obligation to the bank. Moreover, the economic realities of the situation demonstrate that, in providing the required financing to Christie O. L. Gibson was acting merely as a conduit between Christie and the bank. Thus, while in form the loan was made from O. L. Gibson to Christie, in substance it was from the bank, with the interest passing to the bank through O. L. Gibson. Cf. Margolis v. Commissioner (C.A. 9, 1964); 337 F. 2d 1001; Est. of Rosenberg, 36 T.C. 716. The facts do not convince us that O. L. should be considered to have made a loan to Christie. Christie, in need of funds but unable to borrow them on its own credit, was forced to turn to its shareholder O. L. We believe the fact that O. L. in turn had to borrow the money rather than use his own funds is irrelevant. That the funds advanced by O. L. to Christie were 526 borrowed by O. L. does not affect the character of the transaction between O. L. and Christie. That the monies advanced to Christie were borrowed funds does not mean they maintain the character of a loan when subsequently advanced to Christie. *280 The shaky conclusion from petitioner's argument is that funds borrowed by shareholders remain loans when advanced to their corporations. Further, petitioner's argument that O. L. was a mere conduit for the loan is not consonant with the facts. Here, petitioner O. L. was a necessary party to the transaction. Without him the Bank would not have loaned the money. The Bank looked only to him for repayment. Simply, Christie needed money to purchase capital equipment, and was owed money by O. L. by reason of his failure to fulfill his capital contribution agreement. The amounts O. L. owed under this agreement were greater than the amount he purportedly loaned to Christie. From the above, we believe O. L.'s advances to Christie were, in fact, his fulfillment of his obligation to contribute capital to the corporation and as such were equity contributions and not debts. Accordingly, we sustain the Commissioner on this issue and hold petitioner Christie may not deduct as interest the amounts described above. Issue 7 - Deductibility of a Business Bad Debt By T. M. For Money Loaned to the Sheriff of Wise County Petitioner, T. M., loaned $600 to the Sheriff of Wise County (Harold Fleming) *281 and his wife in 1952. A note was executed by the parties evidencing this debt. Of the amount due, $300 was subsequently paid in July 1953. The remaining portion was never repaid and Fleming died in 1958. For that taxable year, petitioner deducted the $300 as a business bad debt. T. M. has not proven that the debt became worthless in 1958. There is nothing to indicate either that the debt was in fact worthless or that the debt became uncollectible in the critical year. That Fleming died in that year is not sufficient to prove worthlessness. We hold for the Commissioner on this issue. [24]
Issue 8 - Additions to Tax for Failure to Timely File Tax Return Christie mailed its Federal income tax return for the calendar year 1957 on June 6, 1958, and the district director received the return on June 9,1958. Attached to Christie's tax return was a copy of the Treasury Department Form 7004 (Application for Automatic Extension of Time to File U.S. Corporation Income Tax Return); however, the form did not bear the customary stamp of the district *282 director indicating that an extension for filing the return had been granted. The Commissioner determined an addition to tax of 25 percent of the deficiency as provided by section 6651(a). The petitioner disputes this determination. Section 6072(b) provides that income tax returns of corporations made on the basis of the calendar year shall be filed on or before the 15th day of March following the close of the calendar year. Accordingly, Christie was required by statute to file its return for calendar year 1957 on or before March 15, 1958, but did not do so until June 1958. Section 6081(b) allows for an automatic extension of three months for the filing of a corporate return, but application must be filed in the manner prescribed by the regulations. Section 1.6081-3(a)(2), Income Tax Regs. provide that: The original application must be filed on or before the date prescribed for the filing of the return with the internal revenue officer with whom the corporation is required to file its income tax return. Clearly, Christie did not comply with this regulation. Petitioner, Christie, does not dispute the facts but contends that the failure was due to *283 reasonable cause and not willful neglect, a good defense to the addition to tax as provided under section 6651(a). In this regard petitioner asserts only: Christie realized no taxable income for the year 1957 upon which a penalty is due for ultimately filing of a return. That Christie "realized" no taxable income during the year in question is not reasonable cause under section 6651(a). The Code and the accompanying regulations specifically provide that all corporations subject to taxation must file a tax return regardless of whether or not they have taxable income. 527 See section 6012(a)(2), and section 1.6012-2(a), Income Tax Regs. Accordingly, based upon the above, we find petitioner Christie is subject to the additions to tax prescribed under section 6651(a) and that the proper amount of penalty for Christie is 15 percent [25] of the amount of Christie's tax deficiency found above for the taxable year 1957. *284 Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Gibson Sales Corporation, docket No. 4551-64; O. L. Gibson and Dotie D. Gibson, docket No. 4552-64; T. M. Gibson and Myrtle P. Gibson, docket No. 4553-64; and Wise Development Company, Inc., docket No. 4554-64.↩
2. The Commissioner has conceded the issue of whether Christie properly elected to be taxed as an electing small business corporation under section 1371 et seq. The other amounts in question are wholly contingent upon the outcome of the other issues presented and will be taken into account under the Rule 50 computation. ↩
3. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.↩
4. For any Rule 50 computation for the purposes of section 1371 et seq., we hold Christie's income and losses should be allocated according to the ownership of the stock as noted in the stock certificate book.↩
*. 1954 through 1960.↩
**. $373.55 here is understated by.30( as is the $3,867.75 here when compared with the amounts shown on the previous schedules. For purposes of our Opinion we accept the larger amounts as being correct. ↩
*. Apparently $1,360 of these two items was supplied by Christie. ↩
*. The balance sheet information contained in the tax return filed by Ruth for the taxable year 1960 disclosed significant unexplained differences when compared with the 1959 tax return. As the balance sheet on the 1960 tax return appears to be in error, for our purposes we accept the amount shown on the 1959 tax return as being correct.↩
5. Except for the addition to tax under section 6651(a).↩
6. Advances to Ruth one-half of which were determined to be constructive dividends to O.L. and to T.M. from the following corporations:
↩
Year
Gibson Sales
Christie
Wise
Total
1956
$48,974.24
$ 8,556.55
$ 5,450.00
$ 62,980.79
1957
0
25,546.70
0
25,546.70
1958
725.28
9,592.88
18,976.48
29,294.64
1959
1,929.36
5,816.70
7,246.86
14,992.92
1960
0
8,905.67
9,212.86
18,118.53
7. "Interest income of $370.17 [for 1959, and $740.34 for 1960] reported as having been received from Christie Coal & Coke Co., Inc. has been included as dividend income in adjustment above."↩
8. Amounts purportedly owed by Ruth that were deducted as bad debts by petitioners during the years in issue. ↩
Year
Christie
Gibson
O.L.
T.M.
Wise
Total
Sales
1956
$12,235.07
0
$14,316.97
$10,672.24
$14,258.78
$ 51,483.06
1957
30,641.08
$14,000.00
4,784.71
15,000.00
0
64,425.79
1958
0
0
0
0
20,440.00
20,440.00
1959
15,409.82
0
0
0
0
15,409.82
1960
8,905.67
0
0
0
17,557.62
26,463.29
$67,191.64
$14,000.00
$19,101.68
$25,672.24
$52,256.40
$178,221.96
9. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
10. Motel Co. v. Commissioner, 340 F. 2d 445, 446 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court; John Town, Inc., 46 T.C. 107, 131↩. 11. Arlington Park Jockey Club, Inc. v. Sauber, 262 F. 2d 902↩ (C.A. 7, 1959).
12. See Martin M. Dittmar, 23 T.C. 789↩.
13. Amounts Owed By
Amounts Charged Off as These amounts are from the records of Ruth's creditors which differ from Ruth's records by a total of approximately $8,000. We accept these amounts as correct. * Ruth as of
Bad As it was impossible to ascertain from the records, we have computed the amounts in issue based upon the assumption that the oldest debts of Ruth were the ones first paid and first charged off as bad debts.
*** Debts Relating
October 21, 1954
to These Amounts
Determined on a FIFO
Basis
1956
1957
T.M. Gibson
$ 38,675.31
$10,672.24
$6,624.00
O. L. Gibson
19,628.04
14,316.97
4,784.71
Christie Coal and Coke Co
5,355.16
4,798.01
Gibson Sales Corporation This amount is not in issue herein as it was paid back to Gibson Sales from the proceeds of the SBA loan. **↩ 38,900.00
0
Wise Development Company
14,258.78
14,258.78
$116,817.29
14. Advances by petitioners made to Ruth or on its behalf to make payments on the SBA loan: Total
Advances
for SBA
Years
Loan
Charged
Off As Bad
Debts Determined on FIFO Basis.
*↩
Purposes
1956
1957
1958
1959
1960
Gibson
$12,873.85
Sales
Wise
25,431.08
$17,260.80
$8,170.28
Christie
11,081.10
$1,136.00
$6,066.00
$2,519.10
1,360.00
T. M.
15,000.00
15. Total fixed assets amounted to $362,831.06 less depreciation of $110,584.56 - net value of fixed assets of $252,246.50.↩
16. There is testimony that the fair market value of the equipment by itself on December 31, 1956, was only $50,000.↩
17. See Goldstein, "Corporate Indebtedness to Shareholders," 16 Tax Law Review 1, 19-20 (1960); Edward G. Janeway, 2 T.C. 197, affd. 147 F. 2d 602↩ (C.A. 2, 1945).
18. Petitioner
Year
Mine Expenses
CashAdvances
Amounts Charged Off As Bad From the facts presented, it was impossible to ascertain exactly which years advances were written off in which subsequent years. **
& Bills Paid
Debts Found Relating to These
Advances
T. M.
1954
1955
$ 695.00
1956
$ 671.00
5,975.00
$ 6,624.00
1957
1,260.53
4,081.43
1958
1,950.00
650.00
1959
975.00
1960
$ 4,856.53
$11,401.43
$ 6,624.00
Christie
1954
1955
$ 3,417.97 As the evidence presented is inadequate in this regard, we have computed this amount which represents the net increase in the account from October 21, 1954 until January 1, 1956. *
1956
$ 5,946.62
2,046.31
$ 6,301.06
1957
10,254.33
9,991.56
24,575.08
1958
3,219.35
3,854.43
1959
5,816.94
12,890.72
1960
7,545.64
7,545.64
$32,782.88
$19,310.27
$51,312.50
Wise
1954
1955
1956
$ 1,500.00
$ 2,919.50
1957
1958
2,746.18
$ 3,179.20
1959
3,378.81
1960
2,043.64
2,866.99
9,387.34
$ 9,668.63
$ 5,786.49
$12,566.54
Gibson
1954
Sales
1955
1956
$12,431.51
$14,000.00
1956 Net cash advances charged against coal sales.
***↩ 24,042.49
1957
1958
$ 725.28
1959
1,555.51
1960
$ 2,280.79
$36,474.00
$14,000.00
19. The amounts here in question are those amounts found not deductible above as bad debts that represented advances to Ruth, payments on the SBA loan and expenses paid by petitioner on the Tacoma Mine as follows: ↩
Christie
$62,393.60
Gibson Sales
$14,000.00
Wise
$37,997.62
20. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including -↩
21. The amount of recoverable coal on the property was estimated to be between 25 and 50 million tons for which Wise was to receive a royalty of between 20 to 25 cents per ton.↩
22. Included in this amount was also the sale of $10.80 worth of Red Dog.↩
23. In passing, T. M.'s attorney at trial, but not on brief, asserted that he should be allowed to deduct these amounts as bad debts. We express no opinion on the propriety of this theory on the facts above because of petitioner's failure to present this issue properly.↩
24. Because of our conclusions above, it is unnecessary for us to consider whether the deduction would have qualified as a business bad debt.↩
25. The penalty is 5 percent per month or fraction thereof, for each month the failure to file continues. Cristie filed its return somewhat less than 3 months late. Accordingly, the proper amount of the addition to tax is 15 percent rather than the 25 percent originally determined. Section 6653(a).↩